Okay, before we get started real quickly, you can start coming on up if you'd like, but before we get into your time here, Mr. I don't think you need to argue this today. I don't have an objection, Your Honor. Okay, so it's okay to argue this case today, and would you like some time to file any kind of response to this? If you'd like seven days. It may depend on how counsel uses it today. I don't foresee a need to file a response at this time. Well, let's put it this way. If you want to file something, file it within seven days. I will certainly do that, Your Honor. Okay. Okay, Mr. Bain. May it please the court. Counsel, my name is Garrett Bain. I'm here today on behalf of Provena St. Joseph, the appellant in this case. And I'm also here with Lauren Whelan. Your Honor, there was quite a bit to review in this matter after over three weeks of trial and a full complement of appellate briefs. And after looking at all of that, a quote from Mark Twain came to mind, and that was, if I had more time, I would have written less. And with that in mind, I will try to keep my comments today very brief, pointed, and direct. More specifically, I'm going to speak primarily, unless there are questions, on the issue of J&OB and whether or not Provena is entitled to that judgment. I would suggest to the court that this case boils down to one main question, and that is, which set of cases does this case fall into? There is the Snelson, Gill, Kravanich, or Kravanich, and Sosnes. Sosnes, I'm sorry. Good to get the last name. Seif, I'm sorry, cases, as well as on the other side, there's Holton, the Northern Trust, and Suttle. Now, what is the difference between these two lines of cases? The difference is, in the Holton case, there was specific expert testimony indicating that the nurse's failure to perform or the hospital staff's failure to perform certain acts resulted in a delayed diagnosis and the loss of a better chance, loss of a better result. In the Snelson case, and those that I discussed, there was not that linkage. There was not the expert testimony, approximate cause, leading the conduct of the nurses or the physical therapists or hospital staff to the damages incurred by the plaintiff. Well, in this case, wasn't there expert testimony, two experts? One said the nurses breached the standard of care, and second testimony that that breach of the standard of care was approximate cause of the plaintiff's injuries. I think that is true. There was that testimony. And I'm going to answer that by first starting out with, it's interesting to note the status and the procedural aspect of this case at this time. This case was tried against three defendants, two doctors, Dr. DePhillips, Dr. Malik, and the hospital. The jury came back with a not guilty or not liable verdict as to the doctors and liable as to the hospital. Initially, both of those rulings were appealed. The plaintiff has now dropped or dismissed the appeal against the two doctors. So that puts us in a framework of what information that the jury decided the doctors were not liable, that the information that they had when they were able to finally make the diagnosis did not support a finding of medical malpractice. Now, the information that Dr. DePhillips had was initially after surgery, Mr. Simchich was not experiencing pain. Then he was administered heparin, an anticoagulant, and he also had physical therapy that same day on the 23rd. All of a sudden he started to experience pain. Dr. DePhillips had that information going into he was there until the 24th, until he went on vacation. There was testimony from Dr. DeLong, plaintiff's expert, that Dr. DePhillips should have performed a rectal examination on the 24th, and he didn't, and that was a deviation from the standard of care. Dr. Malik then took over, and, again, there were multiple reports. Dr. Malik had all the information that Dr. DePhillips had. He had reports from the physical therapist. He had reports from the nurses. He did his own personal examination, sensory and motor examinations every day of the plaintiff. He had the reports of how pain was flush with, down to two or three in some instances, up to an eight in others, that he continued to receive Vicodin for pain. He had reports of pain that all of a sudden on the 25th, I believe it was, or 26th, there was a dropped foot experienced. He had reports on the 27th even of bilateral pain being experienced. And at trial it was the plaintiff's contention that with all this information, Dr. DePhillips and Dr. Malik should have been able to determine the correct diagnosis of cauda echina syndrome. The jury didn't agree. The jury said, no, we didn't think that the information that doctors had suggested that that diagnosis should have been made at that time. It wasn't until the 28th when two things developed. That was a swollen incision and bilateral numbness of the legs. So I would submit that unless that information was available to the physical therapist or the nurses prior to the 28th, there is no way that the jury verdict in favor of plaintiffs against the hospital can stand. It must be reversed in judgment issued for Provino. Now, let's look at what information the experts for plaintiff said that the nurses and the physical therapist should have communicated. There are two theories. One, that they should have duplicated the material that they wrote down in their reports in oral format, should have spoken directly to the physicians. However, Dr. Malik said, I had all the information I needed to make this diagnosis. I don't blame anything that the nurses did. I don't blame anything that the physical therapist did. I had enough information. I did my own examinations, and I followed the standard of care, and that diagnosis wasn't available until the 28th. Interestingly, the nurse expert for plaintiffs said, well, if the physician, the attending physician, had all the information and it would just have been duplicative information, then that wouldn't have been material and it wouldn't have made a difference. So I think that the suggestion that oral communication should have taken place is not a proximate cause of plaintiff's injuries. The second theory was that there was information that was or acts that were not done or communicated that caused the injuries. And I would say the only aspect of testimony, of expert testimony by the nurse, of something that should have occurred that might be material, was Nurse Olzinski said, well, the nurses failed to record sensory observations, and those sensory observations would have shown numbness, potentially. However, there was also testimony that the nurses performed those sensory observations every day, and there wasn't, and nothing was reported as to the existence of any sensory problem. Additionally, sorry, I had a note. Oh, if you're looking at the record, there's 23 days of trial testimony. Nowhere from anyone did they testify that there was any numbness experienced by the plaintiff prior to December 28th. It doesn't exist. It's not there. And without that testimony of numbness prior to the 28th or swollen incision prior to the 28th, the judgment against the hospital just can't stand once again. What about the, there was testimony that the nurses should have charted information like the incontinence, not only bladder but bowel incontinence, and that these often have a neurological link of the loss of tone. What about the, you've got family testifying about these incidents and saying the nurses didn't chart them. I think I have two points. The first point is that Dr. DeLong's testimony against the nurses and physical therapists was based upon deposition testimony of Nurse Ozynski. It was, that's in the 213 disclosures. It was not based upon testimony from the family or really anything else in the record, but based upon what Nurse Ozynski had to say. Nurse Ozynski did not talk about those instances that the family talked about. I think there were four of them. There was a urinary retention event. There was an incident involving an IV cord. There was an incident involving a bowel movement and also stumbling, there were four of them. Dr. Malek spoke to all of those at trial, and he said the urinary retention event was not material vis-a-vis cauda echina because half of men Plaintiff's age have post-surgical urinary retention. So he knew about that, and he put it aside and said it did not support the cauda echina diagnosis. He said, second, the IV cord incident did not suggest cauda echina, but cranial issues and experiencing of confusion by the Plaintiff. The third, involving the bowel movement on the way to the bathroom, did not suggest cauda echina to him either, very similar to his observation as to urinary retention in post-surgical situations with a man of Mr. Simsich's age. Finally, the event of stumbling was a one-sided event, not bilateral, which was not indicative of cauda echina. Again, Dr. Malek was looking for bilateral numbness of the legs. It was a big issue. All right, but there's testimony here that you talk about where the doctor, treating physician says, had I known this, I wouldn't have done anything any different, right? Well, isn't that testimony supposition? I mean, you know, by definition, it's almost hypothetical because it hasn't happened. He's talking about, well, and hey, does a jury have to believe except that? Well, I think I would direct Your Honor to this Nelson v. And specifically to pages 45 to 46 of that opinion. And it kind of goes hand in hand with this supposition made by the plaintiffs that it's a mad conspiracy among medical providers, that, you know, you can't believe Dr. Malek because he was always going to defend the nurses and physical therapists. Well, it turns out that the Illinois Supreme Court doesn't agree with that approach. And it said, first of all, the plaintiff in that case mistakenly assumes that the doctor will not be willing to tell the truth about whether the conduct of hospital nurses affected his decision-making ability. Second, the court says, a plaintiff would always be free to present expert testimony as to what a reasonably qualified physician would do with the undisclosed information and whether the failure to disclose the information was a proximate cause of the plaintiff's injury in order to discredit a doctor's assertion that the nurse's omission did not affect his decision-making. Question, does that testimony appear in this case? No, it does not. There is no testimony in this case that a reasonably qualified physician, not talking about Dr. Malek or Dr. DeFillips, would have acted in such a way, with that information that the plaintiff says the nurses and the physical therapists should have communicated, that it would have resulted in an advanced diagnosis of cardiac cancer and a better result for the plaintiff. That testimony does not exist in the record. And it isn't, let's see, the plaintiff's expert just said that it's my opinion that the failure to provide that information to the nurses is a proximate cause of the plaintiff's injury. That's correct. And I would say that really only amounts to speculation and speculation that is not warranted in light of how the jury came out in this verdict finding the doctors not liable. So, again, using that information to determine what information would the doctors have received that would have changed their action. And the only information that we can take from the entire trial is that it was two things. It was that swollen incision and it was the bilateral numbers. Without that, a verdict against the hospital can't stand. Unless there's any further questions, I'm going to reserve the remainder for rebuttal. Thank you, Your Honor. No, thank you. Mr. Reculia. Thank you. Counsel, Justices, it's my privilege to appear before you. I'd like to, if I might, start off with the last portion of the argument of the affluence in this case about what was and what was not stated insofar as the correctness of the lack of information that was not provided by the nurses to the doctors. I think what we first need to go to is the undisputed testimony of the family. In that record, you will see that the undisputed testimony of the family starts with the 23rd, 24th, 25th, 26th, 27th, and even on to the 28th. And this is what the record will show, that there was pain to such an extent that Mr. Simpson was holding on to his rails of his bed. There was weakness in the lower extremities evidenced by falling down on two or three different occasions. He was crying with pain. He was dropping fecal material during involuntary movements on the floor of the hospital room, and there was leaking of fecal material on the bed, which was observed by the family. Incontinent of bladder, inability to walk, and wrapping an IV cord around his neck because of the pain and trying to reach the bathroom in the early morning hours of Christmas Day. Now, why is that significant? It's significant because Mrs. Osinski, who the nurse expert would claim it's called, testified that charting is extremely important and lack of charting is a deviation from the standard of care. Take that one step further. Dr. Long uses Nurse Osinski's testimony to produce an opinion that the nurse's violations of the standard of care was approximate cause of the damages to Mr. Simpson. Dr. Long also testified that had the surgeons been exercising due care, they would have done two things. If they had acted reasonably, they would have done a digital exam, which would have indicated that there was an abnormal sphincter muscle. And why is that important? Because it's important because that shows that if there's an abnormal sphincter muscle, there's something going on with that lower cauda equina, which motivates the bowel movements as it does the bladder. So, as a result, having done that, the competent neurosurgeon would have taken it one step further and would have done an MRI. Had he done an MRI, he would have noticed that the hematoma was evolving as it was progressing, and the evidence in the case from the testimony of the doctor, or from the testimony of Nurse Osinski and the family, showed that it was an evolving hematoma, and so did the neuroradiologist, Dr. Whipple. If you recall, Dr. Whipple said the start of the hematoma was on the 23rd, and you have to put this in perspective. This is a patient who was high risk. This isn't just a standard laminectomy patient. He was high risk because he was on anticoagulatory medications. Everybody conceded, including Malik, the Phillips, even their experts conceded that Mr. Simsish was a high risk patient and vigilance in his care, post-surgical care, was necessary in order to make certain that any neurological complications that exist are noted and advised to the neurosurgeon or the attending physicians. Now, if I might just go on with Dr. Malik. It's important to understand that Dr. Malik, while he may have on one occasion said that he had all the information he needed, keep in mind that this man's testimony is totally logical. First of all, consider the testimony of the family. By the way, uncontradicted. Not a nurse testified. Not one nurse came into that courtroom and said that the family's observations were false or that they were hyperbole. None. Not one nurse testified. As a matter of fact, the only witness called by the hospital was a nurse expert who contradicted Nurse Osinski, which creates a question of fact for the jury. That's the only witness that testified in this case. And now they're here suggesting to you that a jury that spent five days deciding this case and five weeks of trial, the judge's decision to deny a post-trial motion was an abuse of discretion against the manifest weight of the evidence. But let me go on further, because I think it's important to understand, what did Malik actually say? I have to admit that the record is replete with testimony from Dr. Malik, and I admit it was inconsistent and contradictory depending on who the questioner was. The reasonable implication, however, when you analyze his testimony, is that the lack of communication from the nurses on the progressive deterioration of the plaintiff's condition and the very obvious neurological complications suggest that no sensible or competent neurosurgeon would ignore those particular observations. And why do I say that? The following are excerpts from the record that you will see when you read Dr. Malik's testimony. Here's what he says. Here's what he acknowledged. Abnormal bowel movements, incontinence of bladder, significant increases in pain, radiating pain down the lower extremities, foot drop, weakness of the lower extremities, in his own testimony states, trigger a thought process that cauteric sinus syndrome is progressing. This is what Dr. Malik testified to. This is what the jury heard. Going on, he says that, and I point out that while the signs and symptoms of neurological compromise are not expected to be diagnosed or treated by other specialists, this is Dr. Malik saying this, it would be helpful if these neurological complications are noted in the chart and or are orally communicated. That's what Dr. Malik said before he was cross-examined. By the way, his testimony on he had enough information came out from the testimony of his questioning by his own lawyer. His own lawyer asked him that question, which for whatever reason that was relevant to her case, I don't know, but it is at least an implication that she was trying to protect the nurses in this situation by having the question asked of him rather than have this cross-examination by the Provena doctor. He also said, and it will be in the record, that it's not necessary to wait for all these symptoms of a cauteric quina to show up to begin to test for the cauteric quina syndrome. That's what he said. He said it's sufficient that the patient experiences weakness in the legs, which should immediately trigger a workup for cauteric quina. He conceded, Dr. Malik conceded, that the digital exam and an MRI would have been the appropriate approach to help diagnose the existence of a cauteric quina syndrome. This concedes that the act received Dr. DeLong, who made the testimony, that when you have the symptoms of the cauteric quina, you do these tests, and these tests will then allow you to follow up and do whatever is necessary to treat the particular condition. Now, going on, just to confirm what the family's observations were and their concerns as to what they saw, keep this in mind, keep in mind that this is in the context of a doctor who has written discharge records for four days. Twenty-fifth, he wrote a discharge record. And he said, patient stable. Twenty-sixth, patient stable, discharge.  Twenty-eighth, the day that the eruption occurred, finally, he was due to discharge him. It was only because the Mrs. Simpsons and the nurse, a nurse from the hospital, demanded that he go back in the room and look at what was the culmination of this cauteric quina. Does this sound like a doctor who had all the information he needed? On the contrary. I will give him more credit than probably he's entitled to, but I would at least give him credit to say if you're a competent neurosurgeon and you had all of these observations charted or orally communicated to you, the last thing you would do would be to write discharge. For example, on the 25th, Mr. Simpsons dropped his bowel movement on the floor. He had leakage all over his back. And he wrote a discharge summary for that day. Does that sound like a logical, competent? And I believe he was. He was competent. Do you think he would have written a discharge summary for Mr. Simpsons if that occurred and he was advised of that? I don't think so. As I said, maybe I'm giving him more credit than he's entitled to, but I'm assuming he's competent and with this observation. Well, let me ask you. At one point, didn't he say, even had I known all these things, that everybody says the nurses should have charted or the physical therapist should have done, I wouldn't have done it any differently. He may have said that, but is that logical? Is it reasonable? Does that mean that a jury has to accept that testimony in the face of what they heard from the parents or from the family that was undisputed? Wouldn't the testimony of Dr. DeLong and Nurse Osinski suggest that this type of information would have required a reasonably competent neurosurgeon to take further steps? As a matter of fact, Dr. DeLong testified that had these steps been taken, the injury suffered by Mr. Simpsons would not have necessarily been as egregious as it was. Well, I have a question here. It just dawns on me here. We're assuming Dr. Malik is competent, right? Yes. You follow suit, letting him engage in malpractice, right? That's true. Okay. So why would we even use Malik as a standard for? The reason I'm using Malik as a standard is because the defense in this case is hinging their testimony on the fact, or their position on the fact that Dr. Malik said that he had all the information that he needed. Well, maybe. Now, I agree with the court. He was not competent. So, therefore, his testimony was suspect by the jury, as it was. Two minutes. Pardon? You have two minutes. How many? Two. Okay. Let me just quickly, the Snelson case. I can't believe that a fact basis would be embedded in law by the Supreme Court. That fact basis being that in the Snelson case, Dr. Cam said he had all the information he needed. And that means from now on, the law is any case that comes before this panel where a doctor says I had all the information I needed, that means that the hospital is off the hook. I can't believe that. And the reason I say that is each of those cases are fact basis. For example, look at the Snelson case. Those nurses were proactive. In the two days that Dr. Snelson or Dr. Cam and those nurses were in contact with each other, there were three or four phone calls. Dr. Cam came to the hospital. He called at 10 o'clock at night to find out what was going on. There was a very proactive approach between the doctor and the nurses. And you can't see that here. Dr. Malik admitted he never talked to the nurses once. Not one time. Or to the physical therapist, which, by the way, the physical therapist, there was no expert testified that our expert was contrary. So what you have here is all of these things are facts, if I might suggest to the court, decided by the jury in favor of the plaintiff. At the end of the day, is the standard what this doctor says he would have done, armed with this additional information, what he says he would have done, or what a reasonably qualified surgeon or neurosurgeon in this case would have done? What a reasonably qualified neurosurgeon would have done. That's the standard. And that standard was testified to by Dr. DeLong. Please don't misunderstand my argument. I'm not defending Dr. Malik. What I'm suggesting to the court is the reason I needn't spend any time with this man is because the defense in this case, the hospital, is hanging their hat on his testimony that he had all the information he needed. You heard that for 15 minutes. That's why I have to show you the transition of really what occurred with this doctor. By his own testimony, he said what would have caused him to look into a quadriquina. I had read those to you. It's in the record. Yet he didn't get that information. As I said earlier, I'm giving you more credit than he deserves. And I think Justice Spitton, you're right. It's what a reasonably competent neurosurgeon would have done. And I think in this situation, I think with the information that was observed by the family, undisputed. They could have called a nurse in here and said that's not true. They didn't do it. That's undisputed. And I think with that, with Dr. DeLong testifying, that had that information, had those deviations not been done, this man could have had a better consequence. Thank you. All right. Thank you, Mr. Rucculia. I don't want to mispronounce your name again. Is it Bain? Bain. Bain. Okay. It's all right. It's been pronounced many different ways. I have a friend who spells the name the same way as Bain, so I apologize. No apology necessary. It's clear from what Mr. Rucculia had to say that he thinks that the jury's verdict in favor of Dr. Mouth was totally wrong. And he filed an appeal of that, but then he dismissed it. So it's a little late to be arguing that. He might think that Dr. Mouth didn't have any credibility, that he was just talking out of left field. Well, the jury didn't agree. But the point on this appeal, whether Dr. Malick got a pass is pretty well irrelevant at this stage, isn't it? I would say no, it is not at all irrelevant, because the question was whether or not Dr. Malick would have done anything different or a reasonably qualified physician. And I bring that up, or up, because the Snelson case, again, it provides a road map to plaintiffs. It says, plaintiff, if you've got an attending physician who says, I wouldn't have done anything different if the nurses or physical therapists had come with additional information. It gives you a road map of what to do. You can either cross-examine. Well, in that case, you might have had another defendant on the verdict form. But isn't that still legally supposition when he says, this is what I would have done? It's not a statement of fact because it hasn't happened. And does the jury have to accept it? Yes, because it's uncontradicted. The plaintiff could have come forward and cross-examined Dr. Malick or Dr. DePhillips to elicit information or testimony that, yeah, they might have done something differently. But that's not in this record. The plaintiff could have gone to his expert and said, would a reasonably qualified physician have done something differently?  If you look at this Delson case, if you look at Gill, if you look at the line of cases I discussed before, Kravanich and Seif, all of those cases are instances where the attending physician said, I wouldn't have done anything differently. So there was that fatal gap of evidence between the testimony that the nurses or hospital staff breached the standard of care and that they were the proximate cause of the injuries that were sustained. There was a fatal gap. That fatal gap exists in this case, too. Isn't that exactly what the plaintiff's expert says? That there was a breach by the, we'll just say the nurses, proximate cause of the injuries? Sure, and look at the foundation of what that was made upon. It was made upon a subject of cross-examination, right? You know what's in, and that subject of cross-examination doesn't, it's in evidence. Well, I think the question is whether or not the burden has been met. And to show that that burden has been met, there must be evidence to support the testimony. It must be more than just sheer speculation. Well, wait a minute. You know, you're a trial lawyer. Once an expert gives an opinion, you can come up, you know, sort of tell who's hopeless. Yep, I'd qualify this person as an expert witness. Yep, okay, doctor, so-and-so, do you have an opinion as to such-and-such? Yes, I do. What is it? It's this. Yes, okay, thank you. That's all they've got to do, right? And then any problems with that opinion is subject to cross-examination. Well, what happened here is that Dr. Malek's testimony of proximate cause was based upon a hypothetical of what the physical therapist's testimony, a testimony of the physical therapist making errors, deviating from the standard of care. And if you look at what Mr. Buchanan said, he was their physical therapist, what he focused on was failure to report pain. Well, Dr. Malek knew about that pain, and he said he wouldn't have done anything differently. Dr. Malek's testimony of proximate cause against the nurses was based upon what Nurse Ozinski had to say, and her criticisms were of pain and a failure to chart the sensation reports. But, again, you look at that, and, well, Dr. Malek knew about the pain, and there's nothing in the record to say that there was any sensation problem before December 28th. Don't we have Dr. DeLong, right, who's making this expert opinion, that it's got both of our argument, really, isn't it? If the nurses and physical therapists had adequately charted this, he said we have it fell below the standard of care, that information had been provided, there would have been a different outcome. That's ultimately the conclusion he's trying to make. That's the implication, although he never says that. Okay, but I'm not sure why we're focusing on Malek all the time, because to say that, isn't he implicitly saying a reasonably competent doctor would have done something different, or this patient had this failure to follow standard of care by the nurses and physical therapists? Well, I think to say that's implied or implicit would go against what Snelson was saying, and that there has to be testimony, expert testimony, saying that a reasonably qualified physician would have taken additional steps, found that diagnosis earlier, done the surgery earlier, and the result would have been different. So based upon the argument and the briefs that were submitted, I would ask the court to issue a judgment outstanding the verdict, provina, or an alternative new trial. Thank you. Thank you. Thank you, Mr. Bain. Mr. Cooley, I thank both of you for your arguments here today. The matter will be taken under advisement.